UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

THE COURTLAND COMPANY, INC.,

      Plaintiff,

v.                                    Civil Action No. 2:22-cv-00135

OHIO FARMERS INSURANCE COMPANY,

      Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

      Pending are Ohio Farmers Insurance Company's ("Ohio Farmers")[1] Motion for Summary Judgment (ECF No. 22),[2] and The Courtland Company, Inc.'s ("Courtland") Motion for Partial

---

[1] Courtland initially sued Westfield Insurance Company ("Westfield"). Compl., ECF No. 1. Westfield answered Courtland's complaint and filed a counterclaim. <u>See</u> Answer, ECF No. 5. Subsequently, Westfield filed a Motion for Substitution and Motion to Dismiss and claimed that the proper party to this action was Ohio Farmers. <u>See</u> Mot. for Substitution & Mot. Dismiss, ECF No. 13. Courtland filed no response in opposition to Westfield's motion and on January 9, 2023, the court entered an order granting Westfield's "Motion for Substitution and Motion to Dismiss." <u>See</u> Order, Jan. 9, 2023, ECF No. 30.

      While the court attempts to use the terms "Ohio Farmers" and "Westfield" based on which insurer was acting, these terms are used somewhat interchangeably.

[2] Unless otherwise indicated, all ECF cites are to the docket entries in the action presently before the court (Civil Case No. 2:22-cv-00135). Citations to <u>Courtland II</u> will be denoted as such.

Summary Judgment (ECF No. 24), both filed on December 22, 2022,

and on which briefing concluded on January 12, 2023.


I. BACKGROUND

Each party seeks declaratory judgment on the issue of

whether Ohio Farmers has the duty to defend and indemnify

Courtland on counterclaims filed by Union Carbide Corporation

("Union Carbide" or "UCC") against Courtland in Courtland v.

Union Carbide Corporation ("Courtland II"), No. 2:19-cv-00894,

one of four complex environmental actions involving those

parties.[3]

A.   Courtland II

Courtland initiated Courtland II by filing suit on

December 13, 2019.[4]   See Compl., Courtland II, ECF No. 1.   In its

complaint, Courtland alleged that Union Carbide "has caused the

---

[3] The three other suits between Courtland and Union Carbide are
"Courtland I," 2:18-cv-01230; "Courtland III," 2:21-cv-00101;
and "Courtland IV," 2:21-cv-00487.   On September 28, 2023, the
court entered a memorandum opinion and order in all four
Courtland cases which decided the various claims that were
brought by the parties and tried in a bench trial before the
court that began on July 6, 2022, and ended on August 3, 2022.
See, e.g., Mem. Op. & Order, Sept. 28, 2023, Courtland II, ECF
No. 567.

[4] For a more detailed discussion of the facts underlying
Courtland II, see the court's September 28, 2023 memorandum
opinion and order entered in that case.   See Mem. Op. & Order,
Sept. 28, 2023, Courtland II, ECF No. 567.

release of toxic, noxious harmful and hazardous contaminants into the environment, and such contaminants have become present and threaten to become further present at, on, and under Plaintiff's property. . . ." Id. at ¶ 1.  Courtland brought the following causes of action against Union Carbide: recovery of response costs and declaratory relief under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") (Count I); citizen suit for relief for violations of the Resource Conservation and Recovery Act ("RCRA") subchapter III and the West Virginia Hazardous Waste Management Act (Count II); citizen suit relief for judicial abatement of an imminent and substantial endangerment (Count III); judicial abatement of a public nuisance (Count IV); judicial abatement of a public nuisance per se (Count V); private nuisance (Count VI); negligence (Count VII); negligence per se (Count VIII); gross negligence (Count IX); and strict liability (Count X).

Union Carbide filed a motion to dismiss (Courtland II, ECF No. 9), which the court granted only as to Count VIII (negligence per se).  See Mem. Op. & Order, Aug. 26, 2020, Courtland II, ECF No. 75.  Thereafter, on September 9, 2020, Union Carbide filed its answer and counterclaim against Courtland.  See Answer & Amend. Counterclaim, Courtland II, ECF No. 82.  In its counterclaim, Union Carbide alleged the following causes of action: violation of CERCLA sections 107 and

3

113 (Count I); declaratory relief under CERCLA (Count II);
negligence (Count III); declaratory relief under West Virginia
Law (Count IV); and equitable indemnity (Count V).  Union
Carbide's counterclaims were based on Courtland's ownership of
the "Courtland Property" in South Charleston, West Virginia, and
Courtland's practice of disposing hazardous substances onto the
property.  Answer at ¶¶ 7–9, Courtland II, ECF No. 82.  On
September 30, 2020, Courtland moved to dismiss Union Carbide's
counterclaim (Courtland II, ECF No. 103), which the court
granted without prejudice on May 10, 2021.  See Mem. Op. &
Order, May 10, 2021, Courtland II, ECF No. 250.

On July 21, 2021, Union Carbide filed its Rule 15
Motion for Leave to File an Amended Answer and Re-Alleged
Counterclaims.  Mot. File Amend. Answer, Courtland II, ECF No.
271.  The court granted in part and denied in part this motion
on October 22, 2021.  Mem. Op. & Order, Oct. 22, 2021, Courtland
II, ECF No. 302.  Union Carbide's amended counterclaims asserted
the following causes of action: violation of CERCLA section
107(a) (Count I);[5] violation of CERCLA Section 113(f) (Count II);
declaratory judgment pursuant to CERCLA section 113(g) (Count

---

[5] The court permitted all of Union Carbide's amended
counterclaims to proceed except for the counterclaim brought in
Count I.  The court struck the amended counterclaim brought in
Count I but did not strike the text contained therein.  See Mem.
Op. & Order, Oct. 22, 2021, at 29, Courtland II, ECF No. 302.

III); negligence (Count IV); declaratory relief under West Virginia Law (Count V); and equitable indemnity (Count VI). Amend. Answer, Courtland II, ECF No. 304.

Union Carbide's amended counterclaim asserts "the historical use of the Courtland property is responsible for some or all of the environmental impacts to the Courtland property." Id. at ¶ 7. The Courtland property is currently used to store and dispose of construction waste, but in the past it was used for the "storage and disposal of raw coal, fly ash, diesel fuel, concrete, timber, and other materials." Id. at ¶¶ 11, 20.

Relevantly, the amended counterclaim claims that Union Carbide conducted an investigation of the Courtland property in December 2020, for the purpose of "determin[ing] . . . whether contamination exists on the Courtland property which presents a threat to human health or the environment and whether Courtland is responsible for some or all of that contamination on its property." Id. at ¶ 10. Union Carbide alleges that the soil investigation showed the presence of the following metals and organic chemicals:

> 1,2 Dichloroethane, 1,2 Dibromoethane, 1,1,2 Trichloroethane, Acetone, Benzene, Carbon Tetrachloride, Cyclohexane, Ethylbenzene, Methyl Ethyl Ketone (2-Butanone), Trichloroethene, Toluene, o Xylene, m,p Xylene, total Xylene, Aluminum, Antimony, Arsenic, Barium, Beryllium, Cadmium, Chromium, Cobalt, Copper, Lead, Manganese,

Mercury, Nickel, Selenium, Sodium, Thallium,
Vanadium, Zinc, 1,1 Biphenyl, Acenaphthylene,
Anthracene,                Benzo(a)anthracene,
Benzo(a)pyrene,         Benzo(b)fluoranthene,
Benzo(g,h,i)perylene,   Benzo(k)fluoranthene,
Chrysene,               Dibenzo(a,h)anthracene,
Dibenzofuran,    Fluoranthene,     Fluorene,
Indeno(1,2,3-cd)pyrene,         Naphthalene,
Phenanthrene and Pyrene.

Id. at ¶ 13.  Union Carbide contends "[t]he presence of these

substances shows that Courtland is at lease partially

responsible for environmental impacts on the Courtland property

and potentially the UCC property," id. at ¶ 14, the failure of

Courtland to "control, monitor, or maintain facilities it owns

or operates . . . in a proper and legal manner . . . result[ed]

in the release, disposal, discharge, collection, and

exacerbation of contamination in and at the Courtland Property,"

id. at ¶ 42, and the resulting contamination of the Courtland

Property caused Union Carbide "to suffer damages, including

consequential, incidental, and general damages," id. at 43.

Union Carbide claims it incurred $169,391.58 in costs for the

investigation and analysis and says it will likely incur

additional response costs in the future.  Id. at ¶¶ 16, 25.

B.   Courtland's Case Against Ohio Farmers

After Union Carbide filed its initial counterclaim on

September 9, 2020, "Courtland, [Callaghan (Courtland's

counsel)], and [Callaghan's] co-counsel diligently searched for

evidence of Courtland's historic liability insurance policies for the period from 1980 to 2005." See Callaghan Decl. ¶ 13, Dec. 22, 2022, ECF No. 24-1.[6]  This search uncovered "historic accounting records that [Westfield] had issued the Policies to Courtland in the 1980s." Id. at ¶ 14.  On March 31, 2021, Callaghan "tendered on Courtland's behalf to [Westfield] a defense against and indemnification of the UCC Counterclaim . . . ." Id.  Westfield acknowledged receipt of Courtland's tender letter on April 5, 2021, Email from S. Karapashev, Westfield Complex Claims Specialist, to M. Callaghan, Apr. 5, 2021, Def.'s Resp. Ex. C, ECF No. 27-3.  Westfield sent a letter to Callaghan on May 6, 2021, informing him:

> Based upon available information, Westfield is currently investigating whether your client is entitled to any rights or coverage in connection with any actions or proceedings relating to the above claim under any policy issued by Westfield. . . .
>
> Westfield will conduct an investigation into this matter.  However, please be advised that this investigation is without prejudice and is not intended to waive any rights or obligations of either you or Westfield Insurance under any of Westfield's insurance

---

[6] The court notes that Courtland's counsel in the present action, Michael O. Callaghan, also serves as trial counsel for Courtland in the four underlying environmental actions between Courtland and Union Carbide.  Courtland has filed two declarations authored by Callaghan, one in support of Courtland's motion for partial summary judgment and the other in opposition to Ohio Farmers' motion for summary judgment.  See Dec. 22 Callaghan Decl., ECF No. 24-1; Jan. 5 Callaghan Decl., ECF No. 28-1.

> policies.   Westfield hereby reserves all of
> its rights and defenses under such policies.
>
> Until further information is known about the
> Site, the cause and timing of the release,
> alleged property damage, and the claim being
> made, Westfield cannot complete its coverage
> review and determine whether coverage exists
> for this matter.   Westfield needs the
> cooperation of its insured to provide
> information so that a coverage analysis can be
> completed.

Letter from S. Karapashev to M. Callaghan, May 6, 2021, at 2,
Def.'s Resp. Ex. D, ECF No. 27-4.   Included in that letter was a
list of information requested by Westfield so that it "may
investigate whether there is coverage for this matter."   Id.

Four days later, on May 10, 2021, the court granted
Courtland's motion to dismiss Union Carbide's counterclaim
without prejudice.   Mem. Op. & Order, May 10, 2021, Courtland
II, ECF No. 250.   Two days after that order, Callaghan avers
that he provided Westfield with a copy of the court's order.
Dec. 22 Callaghan Decl. ¶ 18.

On July 21, 2021, Union Carbide filed a motion for
leave to amend to file an amended answer and re-alleged
counterclaim (Courtland II, ECF No. 271).   Callaghan says he
tendered to Westfield a copy of Union Carbide's motion for leave
to amend and provided Westfield with a copy of the proposed
amended counterclaim.   Id. at ¶ 20.   Callaghan then filed a
motion in opposition to Union Carbide's motion for leave to

amend on August 4, 2021 (Courtland II, ECF No. 274), which was apparently also provided to Westfield.  Id. at ¶ 21.  Callaghan avers that on August 13, 2021, he received a message from Westfield's "in-house coverage counsel," Suzanne Karapashev, noting that Westfield was reviewing the tenders and that it would provide a response to Courtland within two weeks.  Id. at ¶ 22.

On October 22, 2021, the court granted Union Carbide's motion for leave to amend, which permitted it to file its amended counterclaim.  Mem. Op. & Order, Oct. 22, 2021, Courtland II, ECF No. 302; Dec. 22 Callaghan Decl. at ¶ 23. Callaghan forwarded that order to Westfield and renewed Courtland's tender.  Dec. 22 Callaghan Decl. at ¶ 24.

Callaghan says that on November 12, 2021, he received a telephone call from Brent Kesner, outside coverage counsel for Westfield.[7]  Id. at ¶ 25.  During this conversation Kesner is said by Callaghan to have stated that Westfield would be providing a defense to Courtland against Union Carbide's amended counterclaim under a reservation of rights.  Id.  According to Callaghan, Kesner also mentioned the possibility of Westfield

---

[7] The court notes that "outside coverage counsel" for Westfield, Brent Kesner, is representing Ohio Farmers in the present action.

filing a declaratory judgment action against Courtland to determine coverage.  Id. at ¶ 26.

Following this conversation, on November 18, 2021, Westfield's panel counsel from the Pittsburgh law firm of Zimmer Kunz, PLLC, entered their appearances on behalf of Courtland in Courtland II.  Notices of Appearance for M. Breneman, B. Lucot, and K. Shimborske-Abel, Courtland II, ECF Nos. 316-18.  In order to fulfill its duties under the insurance policies, Courtland, Callaghan and his co-counsel, and Courtland's lead expert witness (D. Scott Simonton), "provided . . . support and assistance to the Westfield Panel Counsel in efforts to familiarize themselves with the case and to prepare their defense of Courtland to UCC's counterclaims."  Dec. 22 Callaghan Decl. at ¶ 29.

On February 7, 2022, the parties filed a Joint Motion to Continue Trial of Related Actions and All Related Deadlines (Courtland II, ECF No. 326), wherein Courtland proffered and Union Carbide agreed that a three-month extension of deadlines was appropriate to accommodate the new Westfield counsel.  The motion noted that "[n]ewly appointed counsel does not agree that a three (3) month extension is sufficient to come[] up to speed . . . so as to defend Courtland."  Mot. to Continue, Courtland II, ECF No. 326.

The court responded the next day, February 8, 2022, with an order (Courtland II, ECF No. 329) saying it "would consider movement of the entire schedule in these actions by one month" and asking that the parties advise whether they were available on the proposed dates.

On February 14, 2022, the Zimmer Kunz attorneys filed a response to the February 8 order, seeking at least a three-month continuance of the trial date in order for the panel counsel to prepare a defense against Union Carbide's amended counterclaims.[8]  Response, Courtland II, ECF No. 337.  Callaghan says he sent a letter to Westfield's in-house counsel the following day demanding that Westfield appoint himself (Callaghan) and his trial team to represent Courtland, as they were "the only counsel able to timely present a competent defense on behalf of Courtland."  Dec. 22 Callaghan Decl. at ¶ 33.  On February 18, 2022, the court denied Courtland's February 7 motion to continue (Courtland II, ECF No. 341), and Callaghan forwarded the order to Westfield.  Id. at ¶¶ 34–35.

---

[8] In his December 22 declaration, Callaghan says that the February 14, 2022 filing requested the trial date be continued by at least nine months.  Dec. 22 Callaghan Decl. at ¶ 31.  This statement is not supported by the record, which shows Courtland requested "at least three months."

On February 22, 2022, Kesner sent a letter to Callaghan rejecting the demand that Westfield retain Callaghan to defend against Union Carbide's amended counterclaims, due to the "unavoidable conflict" such representation would present. Letter from B. Kesner to M. Callaghan, Feb. 22, 2022, Pl. Mot. Partial Summ. J. Ex. 3, ECF No. 24-4. The letter went on to say that Westfield would be retaining additional attorneys – Teresa Dumire and Jack Hobliztell from the Charleston law firm of Kay Casto & Chaney PLLC – to assist in the representation of Courtland. Id. The letter also noted that the representation continued to be "under reservation of rights." Id. at 4. After this, Callaghan recounts that he, his co-counsel, and Courtland's retained expert once again spent numerous hours explaining the legal and procedural history of Courtland II to new attorneys, this time from Kay Casto & Chaney. See Dec. 22 Callaghan Decl. at ¶ 38.

Callaghan says Westfield again added additional attorneys to the defense team in early March 2022, this time from the law firm of Wood Smith Henning & Breman, and as a result he was again "compelled to bring the new counsel, . . . up to speed on the various counterclaims against Courtland." Id. at ¶ 40.

The Kay Casto & Chaney and Wood Smith Henning & Breman attorneys never entered appearances in Courtland II.  While the Zimmer Kunz attorneys were in the case, they represented only Courtland as counter-defendant.  Callaghan continued to represent and file on behalf of Courtland as plaintiff.

Callaghan says that on March 9, 2022, a telephone conference was held wherein he was informed by Westfield (he does not specify by whom) that it "had made no decision concerning the investigation and that it could do nothing further for Courtland relative to providing a defense to Union Carbide's counterclaims."  Id. at ¶ 42.

The next day, March 10, 2022, Ohio Farmers[9] sent a twenty-page letter to Courtland setting forth Ohio Farmers' coverage position and advising Courtland that Ohio Farmers would be withdrawing its defense.  See Letter from D. Slayton, Ohio Farmers Claims Specialist, to M. Callaghan, Mar. 10, 2022, Courtland Mot. Partial Summ. J. Ex. 1, ECF No. 24-2.  In this correspondence, Ohio Farmers contended that it was "questionable whether the Union Carbide Counterclaim raises a claim for

_____

[9] Up to this point communications from the insurer had been from Westfield.  This is the first time communications were noted as from Ohio Farmers.  Courtland nonetheless brought this declaratory judgment action against Westfield, and it was not until some time into the litigation when Ohio Farmers was formally substituted.

'property damage,' as defined by the Policies." <u>Id.</u> at 18. Ohio Farmers explained that, even assuming the Union Carbide amended counterclaim raised a claim for property damage, "the Counterclaim does not appear to present a claim for injury or damage caused by an 'occurrence,' as defined by the Policies." <u>Id.</u> Finally, Ohio Farmers determined that even if coverage under the policies was triggered by the allegations in Union Carbide's amended counterclaim, coverage would be excluded by the owned property and pollution exclusions. <u>Id.</u> at 18–19.

On March 11, 2022, coverage counsel Breneman, Shimborske-Abel, and Lucot (the Zimmer Kunz attorneys) moved to withdraw their appearance on behalf of Courtland. Mot. to Withdraw Appearance, <u>Courtland II</u>, ECF No. 353. The motion to withdraw details that the three attorneys, as coverage counsel for Westfield, were representing Courtland while Westfield conducted its coverage investigation and that, as Westfield had determined that there is no coverage for the amended counterclaims, Westfield was withdrawing its defense:

> Westfield Insurance Company has concluded its coverage investigation and has determined that coverage (defense and/or indemnification) does not apply for reasons that have been provided to Courtland Company's counsel, Michael O. Callaghan, Esquire. . . .
>
> WHEREFORE, the undersigned, Matthew G. Breneman, Esquire, Kerri Shimborske-Abel, Esquire, and Brian M. Lucot, Esquire respectfully request that this Honorable Court

14

> enter an Order discharging them from all
> duties and responsibilities as counsel for
> Counter-Defendants, The Courtland Company,
> Inc. and granting them leave to withdraw as
> counsel for The Courtland Company, Inc.

Id. at 3–4.  The motion further says Courtland will not be

prejudiced by the withdrawal as it continues to be represented

by Callaghan, "who has served as lead trial counsel for all

matters related to the four pending Courtland cases and will

continue to represent it in this matter through trial."  Id. at

¶ 16.

After the passage of more than two weeks and no

objection to the motion having been filed, the court granted the

motion on March 29, 2022, excusing the Zimmer Kunz attorneys.

Order, Mar. 29, 2022, Courtland II, ECF No. 384.  The order

noted that "there appear[s] to be no prejudice to the parties or

to the action," and concluded:

> Matthew G. Breneman, Esquire, Kerri
> Shimborske-Abel, Esquire, Brian M. Lucot,
> Esquire are hereby discharged from all duties
> and responsibilities as to Counter-Defendant,
> The Courtland Company, Inc. in this case; and
> . . . are hereby granted leave to withdraw as
> counsel as to the Counter-Defendant, The
> Courtland Company, Inc.

Id.

On March 11, 2022, in response to Ohio Farmers' denial

of coverage, and shortly after the motion for withdrawal of the

Zimmer Kunz attorneys was filed that same day, Courtland filed

the complaint in the instant action.  See Compl., ECF No. 1.
The three-count complaint seeks damages for breach of contract
(Count I), declaratory relief (Count II), and an injunctive
order by which Ohio Farmers would be required to pay for
Courtland's defense (Count III).  Id. at ¶¶ 38–55.  On April 15,
2022, Ohio Farmers filed a counterclaim seeking a declaration
that "the Ohio Farmers Policies do not provide coverage for the
defense or indemnification of Courtland for the claims asserted
against it by UCC in UCC's Amended Counterclaims" and "Ohio
Farmers has no duty to defend or indemnify Courtland for the
claims asserted against it by UCC in UCC's Amended
Counterclaim."  Answer at 30, ECF No. 5.


## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that
summary judgment is proper where "the movant shows that there is
no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  The burden is on the nonmoving party to show that there
is a genuine issue of material fact for trial.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "The nonmoving
party must do so by offering 'sufficient proof in the form of
admissible evidence' rather than relying solely on the
allegations of her pleadings."  Guessous v. Fairview Prop.

Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016) (quoting Mitchell
v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993)).  The
court must "view the evidence in the light most favorable to the
[nonmoving] party." Tolan v. Cotton, 572 U.S. 650, 657 (2014)
(internal quotation marks omitted); see also Variety Stores,
Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651, 659 (4th Cir.
2018).

        When faced with cross-motions for summary judgment,
the court, applying the above standard, must consider "each
motion separately on its own merits to determine whether either
of the parties deserves judgment as a matter of law." Rossignol
v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal
quotation marks omitted).  "The court . . . cannot weigh the
evidence or make credibility determinations." Jacobs v. N.C.
Admin. Off. of Cts., 780 F.3d 562, 569 (4th Cir. 2015); see also
Lee v. Town of Seaboard, 863 F.3d 323, 327 (4th Cir. 2017).  In
general, if "an issue as to a material fact cannot be resolved
without observation of the demeanor of witnesses in order to
evaluate their credibility, summary judgment is not
appropriate." Fed. R. Civ. P. 56 advisory committee's note to
1963 amendment.

### III. ANALYSIS

A.   <u>Scope of Coverage</u>

        Courtland and Ohio Farmers dispute both when Ohio
Farmers began providing insurance coverage to Courtland and the
terms of the 1987–1988 policy.  Courtland maintains that Ohio
Farmers "issued multiple policies of liability insurance" to
Courtland, which began "no later than 1987 and end[ed] . . .
approximately in 2001."  Callaghan Decl. at ¶ 6, Jan. 5, 2023,
ECF No. 28-1.  At the same time, Courtland argues that Ohio
Farmers may have provided it with coverage prior to 1987 and as
late as 2005, inasmuch as there is "secondary evidence in
Courtland's historic accounting records" which indicates that
Ohio Farmers issued insurance policies to Courtland during that
time.  Jan. 5 Callaghan Decl. at ¶ 13; <u>see</u> Compl. at ¶ 5; Letter
from M. Callaghan to Westfield, Mar. 31, 2021, Def.'s Resp. Ex.
B, ECF No. 27-2.  Courtland also contends that because Ohio
Farmers has failed to produce the policy for the 1987–1988
period, there is insufficient evidence to show that the same
pollution exclusion found in the 1988–1989 policy was included
in the 1987–1988 policy.

        Ohio Farmers contends that it provided liability
insurance coverage to Courtland from August 28, 1987, until
August 28, 2001.  Def.'s Mem. Supp. 33, ECF No. 23; <u>see also</u>

Ins. Pol'ys 1988–89 to 2000–01, Def.'s Mem. Supp. Exs. B–N, ECF Nos. 22-2 to 22-14.  Ohio Farmers argues that West Virginia law places the burden on Courtland to prove the existence of and the terms of the missing policies and that Courtland has failed to produce any evidence to show that policies were issued prior to 1987, that policies were issued until 2005, or the material terms of the 1987–1988 policy.  Def.'s Mem. Supp. 33.

Under West Virginia law[10] "[t]he proponent of a lost or missing instrument must prove its existence and contents with clear and conclusive evidence."  Syl. Pt. 2, Est. of Bossio v. Bossio, 785 S.E.2d 836 (W. Va. 2016); see also Payne v. Weston, 466 S.E.2d 161, 165 (W. Va. 1995) ("Under West Virginia law, the plaintiffs must prove both the existence of an applicable insurance contract and its material terms. It is only when the plaintiffs have established a prima facie case of coverage that the burden of production shifts to the defendants."); Hill v. Emp. Res. Grp., LLC, 816 F. App'x 804 (4th Cir. 2020).

In this instance, Courtland, as the party seeking to enforce the insurance coverage agreements allegedly entered into

---

[10] In cases such as the present one, which invoke this court's diversity jurisdiction, the court is "obliged to apply the substantive law of the state in which it sits."  Volvo Constr. Equip. N. Am. v. CLM Equip. Co., 386 F.3d 581, 599–600 (4th Cir. 2004) (citing Erie R. Co. v. Tompkins, 304 U.S. 64, 79 (1938)).

by the parties prior to 1987, bears the burden of showing the existence of such agreements.  Inasmuch as Courtland has presented no evidence to support its assertion that Ohio Farmers provided it with insurance coverage prior to 1987 or after August 28, 2001, the court finds that Courtland has failed to carry its burden to establish coverage during that time. Further, as Courtland has provided no evidence to prove the material terms of the insurance policy for the 1987–1988 period, the court finds that Courtland has failed to meet its burden to prove the terms of that policy.

The court also finds that the assertions made by Ohio Farmers are insufficient to establish the terms of the 1987–1988 policy.  In its briefing, without providing any evidence in support, Ohio Farmers claims that the 1987–1988 policy would have contained the same pollution exclusion as the 1988–1989 policy, as both policies would have utilized the same form.[11] This statement is not supported by any corroborating affidavit, deposition testimony, or other record evidence.  Inasmuch as neither Courtland nor Ohio Farmers can establish the terms of

---

[11] Ohio Farmers claims that due to its "document retention policy" it "no longer has access to certain historic policy materials and is unable to entirely reconstruct the 1987–1988 policy."  Def.'s Mem. Supp. 7 n. 3.

the 1987–1988 policy, the court is unable to consider this policy in its analysis.

B.    Terms of the Applicable Policies

In support of its motion for summary judgment, Ohio Farmers filed fourteen exhibits comprising over 1,200 pages. See ECF Nos. 22-1 to 22-14.  Thirteen of these exhibits are the insurance policies issued by Ohio Farmers to Courtland from August 28, 1988, through August 28, 2001.  See Ins. Pol'ys 1988–1989 to 2000–2001, Def.'s Mem. Supp. Exs. B–N, ECF Nos. 22-2 to 22-14.  While Ohio Farmers has inserted some policy provisions directly into its briefing, it has failed to provide pinpoint record citations to the policy provisions at issue, which are not inserted in their briefing yet are contained in the thirteen years of insurance policies.[12]  The failure by Ohio Farmers to provide the court with pinpoint citations to the policy provisions at issue has made the court's task exceedingly difficult.  See United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991).

---

[12] For example, Ohio Farmers contends that the policies "contain broad pollution exclusions which eliminate coverage for any liability arising from the escape of pollutants," and that all the policies "expressly exclude claims for damage to property owned by, rented, or occupied by Courtland," yet it merely states, "See Exhibits B through N."  Def.'s Mem. Supp. 24–26.

All thirteen policies contain Commercial General Liability Coverage ("CGL"), which include "Insuring Agreements."[13] While not all the CGL policies use the same language in the "Insuring Agreement," all the policies provide the same coverage, which requires Ohio Farmers to "pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." Ins. Pol'y 1988–1989 at 34, ECF No. 22-2.[14] Ohio Farmers is obligated to pay damages owed by its insured when property damage occurs during the policy period due to an "occurrence," when the "occurrence" takes place in the "coverage territory." Id. In such instances, Ohio Farmers has "the right and duty to defend any 'suit' seeking those damages." Id.

---

[13] Ohio Farmers notes in its briefing that, along with the CGL policies it issued to Courtland, it provided Courtland with Commercial Excess Liability coverage and Commercial Umbrella coverage. The Commercial Excess and Umbrella coverages contain similar language to the CGL coverage and include pollution and owned property exclusions. See Def.'s Mem. Supp. 10–17.

[14] See also Ins. Pol'y 1989–1990 at 34, ECF No. 22-3; Ins. Pol'y 1990–1991 at 40, ECF No. 22-4; Ins. Pol'y 1991–1992 at 13, ECF No. 22-5; Ins. Pol'y 1992–1993 at 41, ECF No. 22-6; Ins. Pol'y 1993–1994 at 43, ECF No. 22-7; Ins. Pol'y 1994–1995 at 42, ECF No. 22-8; Ins. Pol'y 1995–1996 at 44, ECF No. 22-9; Ins. Pol'y 1996–1997 at 45, ECF No. 22-10; Ins. Pol'y 1997–1998 at 52, ECF No. 22-11; Ins. Pol'y 1998–1999 at 49, ECF No. 22-12; Ins. Pol'y 1999–2000 at 45, ECF No. 22-13; and Ins. Pol'y 2000–2001 at 48, ECF No. 22-14.

Albeit with some slight variation, the policies generally define "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property; or [l]oss of use of tangible property that is not physically injured." Id. at 43.[15]  The policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Id. at 42.[16]  Beginning with the 1991–1992 policy and in all subsequent policies, the definition of "property damage" included language indicating that physical injury to tangible property is deemed to occur at the time of the physical injury that caused it, while the loss of use of tangible property that is not physically injured is deemed to have occurred at the time

_____

[15] See also Ins. Pol'y 1989–1990 at 43, ECF No. 22-3; Ins. Pol'y 1990–1991 at 49, ECF No. 22-4; Ins. Pol'y 1991–1992 at 22, ECF No. 22-5; Ins. Pol'y 1992–1993 at 50, ECF No. 22-6; Ins. Pol'y 1993–1994 at 52, ECF No. 22-7; Ins. Pol'y 1994–1995 at 52, ECF No. 22-8; Ins. Pol'y 1995–1996 at 54, ECF No. 22-9; Ins. Pol'y 1996–1997 at 55, ECF No. 22-10; Ins. Pol'y 1997–1998 at 64, ECF No. 22-11; Ins. Pol'y 1998–1999 at 61, ECF No. 22-12; Ins. Pol'y 1999–2000 at 57, ECF No. 22-13; and Ins. Pol'y 2000–2001 at 60, ECF No. 22-14.

[16] See also Ins. Pol'y 1989–1990 at 42, ECF No. 22-3; Ins. Pol'y 1990–1991 at 48, ECF No. 22-4; Ins. Pol'y 1991–1992 at 22, ECF No. 22-5; Ins. Pol'y 1992–1993 at 50, ECF No. 22-6; Ins. Pol'y 1993–1994 at 52, ECF No. 22-7; Ins. Pol'y 1994–1995 at 51, ECF No. 22-8; Ins. Pol'y 1995–1996 at 53, ECF No. 22-9; Ins. Pol'y 1996–1997 at 12, ECF No. 22-10; Ins. Pol'y 1997–1998 at 63, ECF No. 22-11; Ins. Pol'y 1998–1999 at 60, ECF No. 22-12; Ins. Pol'y 1999–2000 at 56, ECF No. 22-13; and Ins. Pol'y 2000–2001 at 59, ECF No. 22-14.

of the occurrence that caused it.  <u>See</u> Ins. Pol'y 1991–1992 at 22, ECF No. 22-5.

Each of the policies for the years 1988–1989, 1989–1990, and 1990–1991 contain language similar or identical to the following pollution exclusion, which excludes coverage for:

> f. (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
>
>> (a) At or from premises you own, rent or occupy;
>>
>> (b) At or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste;
>>
>> (c) Which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for you or any person or organization for whom you may be legally responsible; or
>>
>> (d) At or from any site or location on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations:
>>
>>> (i) if the pollutants are brought on or to the site or location in connection with such operations; or
>>>
>>> (ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.
>
>> (2) Any loss, cost, or expense arising out of any governmental direction or request that you test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

> Pollutants means any solid, liquid, gaseous
> or thermal irritant or contaminant,
> including smoke, vapor, soot, fumes, acids,
> alkalis, chemicals and waste. Waste includes
> materials to be recycled, reconditioned or
> reclaimed.

Id. at 35.[17]

Beginning with the 1991–1992 policy and continuing until coverage ended on August 28, 2001, each policy substituted the above-quoted language with a "total pollution exclusion," which incorporated and expanded the terms of the previous pollution exclusion.  Ins. Pol'y 1991–1992 at 28, ECF No. 22-5.[18] The total pollution exclusion most notably expanded section (f)(2) from the above-quoted language so as to read:

> (2) Any loss, cost or expense arising out of
> any:
>
> > (a) Request, demand or order that any
> > insured or others test for, monitor,

---

[17] See also Ins. Pol'y 1989–1990 at 35, ECF No. 22-3; Ins. Pol'y 1990–1991 at 41, ECF No. 22-4; Ins. Pol'y 1991–1992 at 14, ECF No. 22-5; Ins. Pol'y 1992–1993 at 42, ECF No. 22-6; Ins. Pol'y 1993–1994 at 44, ECF No. 22-7; Ins. Pol'y 1994–1995 at 43, ECF No. 22-8; Ins. Pol'y 1995–1996 at 45, ECF No. 22-9; Ins. Pol'y 1996–1997 at 46, ECF No. 22-10; Ins. Pol'y 1997–1998 at 53–54, ECF No. 22-11; Ins. Pol'y 1998–1999 at 50–51, ECF No. 22-12; Ins. Pol'y 1999–2000 at 46–47, ECF No. 22-13; and Ins. Pol'y 2000–2001 at 49–50, ECF No. 22-14.

[18] See also Ins. Pol'y 1992–1993 at 56, ECF No. 22-6; Ins. Pol'y 1993–1994 at 56, ECF No. 22-7; Ins. Pol'y 1994–1995 at 58, ECF No. 22-8; Ins. Pol'y 1995–1996 at 60, ECF No. 22-9; Ins. Pol'y 1996–1997 at 61, ECF No. 22-10; Ins. Pol'y 1997–1998 at 70, ECF No. 22-11; Ins. Pol'y 1998–1999 at 69, ECF No. 22-12; Ins. Pol'y 1999–2000 at 65, ECF No. 22-13; and Ins. Pol'y 2000–2001 at 68, ECF No. 22-14.

clean up, remove, contain, treat,
detoxify or neutralize, or in any way
respond to, or assess the effects of
pollutants; or

(b) Claim or suit by or on behalf of a
governmental authority for damages
because of testing for, monitoring,
cleaning up, removing, containing,
treating, detoxifying or neutralizing,
or in any way responding to, or assessing
the effects of pollutants.

Id.

Lastly, each policy issued by Ohio Farmers to
Courtland from 1988 to 2001 contained an "owned property"
exclusion which, in relevant part, excludes coverage of property
damage to "[p]roperty you own, rent, or occupy . . . ."  Ins.
Pol'y 1988–1989 at 35–36, ECF No. 22-2.[19]

C.   Applicability of Coverage Exclusions

Liability insurance policies impose two main duties on
the part of the insurer, the duty to defend and the duty to
indemnify.  Aetna Cas. & Sur. Co. v. Pitrolo, 342 S.E.2d 156,
160 (W. Va. 1986).  "As a general rule, an insurer's duty to

---

[19] See also Ins. Pol'y 1989–1990 at 35–36, ECF No. 22-3; Ins.
Pol'y 1990–1991 at 41–42, ECF No. 22-4; Ins. Pol'y 1991–1992 at
15, ECF No. 22-5; Ins. Pol'y 1992–1993 at 43, ECF No. 22-6; Ins.
Pol'y 1993–1994 at 45, ECF No. 22-7; Ins. Pol'y 1994–1995 at 44,
ECF No. 22-8; Ins. Pol'y 1995–1996 at 46, ECF No. 22-9; Ins.
Pol'y 1996–1997 at 47, ECF No. 22-10; Ins. Pol'y 1997–1998 at
54–55, ECF No. 22-11; Ins. Pol'y 1998–1999 at 51–52, ECF No. 22-
12; Ins. Pol'y 1999–2000 at 48, ECF No. 22-13; and Ins. Pol'y
2000–2001 at 51, ECF No. 22-14.

defend is tested by whether the allegations in the plaintiff's complaint are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy." Id. Insurers "must look beyond the bare allegations contained in the third party's pleadings and conduct a reasonable inquiry into the facts in order to ascertain whether the claims asserted may come within the scope of the coverage that the insurer is obligated to provide." Syl. Pt. 6, Farmers & Mechs. Mut. Ins. Co. of W. Va. v. Cook, 557 S.E.2d 801 (W. Va. 2001). If any of the claims may trigger coverage, an insurer is obligated to defend its insured against all claims. Horace Mann Ins. Co. v. Leeber, 376 S.E.2d 581, 584 (W. Va. 1988) (citing Donnell v. Transp. Ins. Co., 589 F.2d 761, 765 (4th Cir. 1978), as amended on denial of rehearing, Jan. 30, 1979) ("if part of the claims against an insured fall within the coverage of a liability insurance policy and part do not, the insurer must defend all of the claims, although it might eventually be required to pay only some of the claims"). But "a liability insurer need not defend a case against the insured if the alleged conduct is entirely foreign to the risk insured against." Id. at 584.

If an insurer "seeks to avoid liability through the operation of an exclusion, the insurance company has the burden of proving the exclusion applies to the facts in the case." Cook, 557 S.E.2d at 806; Dow v. Liberty Ins. Co., No. 3:19-0486,

2022 WL 17365258 (S.D.W. Va. Dec. 1, 2022).  "Where the policy
language involved is exclusionary, it will be strictly construed
against the insurer in order that the purpose of providing
indemnity not be defeated."  Syl. Pt. 4, Cook, 557 S.E.2d 801
(quoting Syl. Pt. 5, Nat'l Mut. Ins. Co. v. McMahon & Sons,
Inc., 356 S.E.2d 488 (W. Va. 1987), overruled on other grounds
by Parsons v. Halliburton Energy Servs., Inc., 785 S.E.2d 844
(W. Va. 2016)); Syl. Pt. 1, Westfield Ins. Co. v. Sistersville
Tank Works, Inc., 895 S.E.2d 142 (W. Va. 2023) (quoting Syl. Pt.
3, Polan v. Travelers Ins. Co., 192 S.E.2d 481 (W. Va. 1972))
("'An insurance policy which requires construction must be
construed liberally in favor of the insured.'").  When analyzing
provisions of an insurance policy, West Virginia law requires
that the policy's language should be given its "plain, ordinary
meaning."  Allied World Surplus Lines Ins. Co. v. Day Surgery
Ltd. Liab. Co., 451 F. Supp. 3d 577, 583 (S.D.W. Va. 2020)
(quoting Syl. Pt. 8, Cherrington v. Erie Ins. Prop. & Cas. Co.,
745 S.E.2d 508 (W. Va. 2013)).

     Here, Ohio Farmers agreed to provide liability
insurance to Courtland for property damage caused by an
"occurrence" occurring during the coverage period and within the
coverage territory.  Ohio Farmers argues that summary judgment
is appropriate inasmuch as Union Carbide's amended counterclaims
are excluded under either the pollution exclusion in effect from

the August 28, 1988, through August 28, 1991 policy periods or
the total pollution exclusion which was in effect beginning with
the policy issued on August 28, 1991, and included in each
subsequent policy.  Ohio Farmers contends as well that the owned
property exclusion, which precludes coverage for "property
damage" to property owned, rented, or occupied by the insured,
is also a basis for denying coverage.[20]

In opposition, Courtland's primary argument is not
that the pollution and total pollution exclusions are
inapplicable, but instead that Ohio Farmers "acknowledged and
accepted" its duty to defend under the policies "without having
reserved the right to withdraw its defense based upon the . . .
pollution [and owned property] exclusion[s]," and as a result,
Ohio Farmers may not now deny coverage based on these
exclusions.  Courtland Resp. 11–17, ECF No. 28.

As previously noted, Ohio Farmers has provided
evidence that beginning with the policy issued to Courtland on
August 28, 1988, and in each subsequent policy, some form of the

---

[20] Ohio Farmers also argues that no coverage exists because Union
Carbide's amended counterclaims do not allege property damage
arising out of an occurrence while the policies were in effect
and Union Carbide's amended counterclaims seek the recovery of
economic losses, rather than losses caused by property damage.
Def.'s Mem. Supp. 27–33.  The court need not reach these
arguments in light of the court's conclusion regarding the
applicability of the pollution exclusions.

pollution exclusion was included in the policies issued to Courtland.  The 1988–1989 pollution exclusion excluded coverage for property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants at or from premises owned, rented, or occupied by the insured. Such a provision remained in each subsequent policy until the policy issued on August 28, 1991, which, along with each subsequent policy, replaced the pollution exclusion with the total pollution exclusion.

The total pollution exclusion covers all remaining years in issue and excludes coverage for property damage which would not have occurred but for the actual, alleged or threatened discharge, dispersal, release, or escape of pollutants.  The total pollution exclusion also excludes coverage for any loss, cost, or expense arising out of any request, demand, or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assesses the effects of pollutants.

The policies generally define "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property; or [l]oss of use of tangible

property that is not physically injured." Ins. Pol'y 1988–1989 at 43, ECF No. 22-2.[21]

Union Carbide's amended counterclaims are based on the release or threatened release of CERCLA-defined "Hazardous Substances," by Courtland and its lessees. Courtland II, ECF No. 271 at ¶ 21. As previously noted, Union Carbide listed in its counterclaim numerous hazardous substances found on the Courtland property. A number of these identified substances, including, Acetone; 1,2 Dichloroethane; Benzene; Cadmium; Carbon Tetrachloride; Cyclohexanone; Ethylbenzene; Benzo[b]fluoranthene; Benzo[b]anthracene; Benzo[a]pyrene; and Dibenzo[a,h]anthracene, are deemed hazardous substances under 40 C.F.R. section 302.4. See 40 C.F.R. § 302.4(a).

Both the pollution exclusion and total pollution exclusion define a pollutant as follows:

> [A]ny solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

---

[21] See also Ins. Pol'y 1989–1990 at 43, ECF No. 22-3; Ins. Pol'y 1990–1991 at 49, ECF No. 22-4; Ins. Pol'y 1991–1992 at 22, ECF No. 22-5; Ins. Pol'y 1992–1993 at 50, ECF No. 22-6; Ins. Pol'y 1993–1994 at 52, ECF No. 22-7; Ins. Pol'y 1994–1995 at 52, ECF No. 22-8; Ins. Pol'y 1995–1996 at 54, ECF No. 22-9; Ins. Pol'y 1996–1997 at 55, ECF No. 22-10; Ins. Pol'y 1997–1998 at 64, ECF No. 22-11; Ins. Pol'y 1998–1999 at 61, ECF No. 22-12; Ins. Pol'y 1999–2000 at 57, ECF No. 22-13; and Ins. Pol'y 2000–2001 at 60, ECF No. 22-14.

See, e.g., Ins. Pol'y 1988–1989 at 35, ECF No. 22-2; Ins. Pol'y 1991–1992 at 28, ECF No. 22-5.  Courtland does not dispute that the substances listed by Union Carbide in its amended counterclaim are "pollutants" as defined by the pollution and total pollution exclusions.

Due to the broad sweep of the pollution exclusion and total pollution exclusion's definition of "pollutants," the substances at issue in Union Carbide's amended counterclaim are "pollutants" as defined by the policies.  Union Carbide's amended counterclaim clearly alleges that the activities of Courtland and Courtland's lessees "have contributed to the release or threatened release" of hazardous substances.  Amend. Answer at ¶ 21, Courtland II, ECF No. 304.

The "environmental impacts" alleged in the Union Carbide counterclaim are likely not "property damage" covered by the policies.  Regardless, because the allegations in Union Carbide's amended counterclaim are based on activities of Courtland and its lessees which caused the release or threatened release of hazardous substances, the court concludes that the pollution exclusion in effect from August 28, 1988, through August 28, 1991, and total pollution exclusions in effect from August 28, 1991, through August 28, 2001, are applicable and

preclude coverage.[22]  Thus, the terms of the Ohio Farmers insurance policies do not cover the harms alleged in Union Carbide's amended counterclaims and Ohio Farmers did not have a duty to indemnify Courtland against the counterclaims.

D.   Duty to Defend and Withdrawal of Defense

In West Virginia, an insurer has a duty to defend the insured if coverage is mandated by the policy or if, once undertaken, withdrawal of the defense is precluded by the doctrines of waiver or estoppel.  See, e.g., Flowers v. Max Specialty Ins. Co., 761 S.E.2d 787 (W. Va. 2014); Tackett v. Am. Motorists Ins. Co., 584 S.E.2d 158 (W. Va. 2003); Potesta v. U.S. Fid. & Guar. Co., 504 S.E.2d 135 (W. Va. 1998).

Although it has often discussed both the insurer's duty to defend and when that duty emerges, the West Virginia Supreme Court of Appeals has not explicitly described under what circumstances an insurer may withdraw its defense once that insurer has undertaken a defense of an insured under a reservation of rights pending determination of whether coverage exists under the policy.  Courtland asserts that because Ohio Farmers "acknowledged and accepted its duty [to defend]," the

---

[22] Since the court has determined that the pollution and total pollution exclusions apply to preclude coverage, the court need not determine whether the owned property exclusion is applicable.

duty persists until "(1) the counterclaims have been fully and
finally resolved by a non-appealable judgment or a settlement;
(2) or a court determines in a declaratory judgment action that
there is no such duty," Courtland Mem. Supp. 10, ECF No. 25.
That assertion is unsupported by any West Virginia authority.

Indeed, the West Virginia Supreme Court of Appeals has
written that "[i]f the causes of action alleged in the
plaintiff's complaint are entirely foreign to the risks covered
by the insurance policy, then the insurance company is relieved
of its duties under the policy." State Auto. Mut. Ins. Co. v.
Alpha Eng'g Servs., Inc., 542 S.E.2d 876, 880 (W. Va. 2000)
(citing Silk v. Flat Top Const., Inc., 453 S.E.2d 356 (W. Va.
1994); Leeber, 376 S.E.2d 581).  When discussing the insurer's
duty to defend, courts do not find the duty different where the
insurer offered a preliminary defense under a reservation of
rights and later withdrew that defense, or where the tender was
immediately rejected by the insurer; the duty to defend is the
same regardless.  See, e.g., Silk, 453 S.E.2d 356.

In Potesta, the West Virginia Supreme Court of
Appeals' seminal case on waiver and estoppel in insurance
contexts, the court held that "the principles of waiver and
estoppel are inoperable to extend insurance coverage beyond the
terms of an insurance contract," but recognized that an

"exception applies when an insurer has represented the insured without a reservation of rights."[23]  504 S.E.2d at 147–48.  While not explicitly stated, this caselaw supports the proposition that insurance coverage initially supplied with a reservation of rights can later be withdrawn upon a determination that no coverage exists, subject only to the limitations of waiver and estoppel – not to the supposed limitations offered by Courtland.

Courtland cites to an unpublished state circuit court decision from Morgan County that defined additional contours of the insurer's duty once undertaken.  In U.S. Silica Co. v. Ace Fire Underwriters Insurance Co., No. 06-C-2, 2012 W.V. Cir. LEXIS 4449 (W. Va. Cir. Ct. Nov. 27, 2012), the trial court determined that "an insurer's duty to defend continues until conclusion of the case, until a Court excuses the duty or until funds have been exhausted under the terms of the comprehensive general liability policy."  2012 W.V. Cir. LEXIS 4449, at *12. These restrictions are not discussed in Potesta or in any other case cited by Courtland.

_____

[23] The two other exceptions considered by Potesta that may operate to extend insurance coverage under the principles of waiver and estoppel, in addition to failure to state that the defense is offered under a reservation of rights, exist when there has been "a misrepresentation at the policy's inception that resulted in the insured being prohibiting from procuring the coverage s/he desired" and when the insurer acted in bad faith.  Id. at 148.

In support of its position, Courtland cites to three cases from foreign jurisdictions – National Indemnity Co. v. State, 499 P.3d 516 (Mont. 2021), Osprey Consulting I, Inc. v. Westport Insurance Corp., 466 F. Supp. 3d 532 (D. Md. 2020), and Auto-Owners Insurance Co. v. Potter, 242 F. App'x 94 (4th Cir. 2007) (unpublished) (applying North Carolina law).

In National Indemnity, the Montana court was faced with "extraordinary and unprecedented circumstances" when attempting to determine if the insurer, National, breached its duty to defend the State of Montana under Montana law for personal injury claims brought by certain mine workers exposed to asbestos.  499 P.3d at 516, 534.  Four years after National was first notified of pending claims that were potentially covered by the insurance policy, and having provided no defense to the State during that time, it offered a "tender of a full defense" to the State subject to a reservation of rights "under the Policy and applicable law," which the State rejected.  Id. at 531–32.  In all, National waited six years before filing a declaratory judgment action to determine the scope of insurance coverage.  Id. at 534–35.  During these six years, while National stood by, "[t]he State proceeded to provide [its own] defense of the various Claims as they were filed, including the settlement of a number of those Claims."  Id.  Based on the State's rejection of National's tender of a full defense with

reservation of rights and the subsequent six-year delay in bringing a declaratory judgment action while National stood by, the Montana Supreme Court found that National had breached the "duty to defend by its many-year delay in seeking judicial resolution of its reserved coverage issues."  Id. at 536.

As correctly noted by Ohio Farmers, this "decision involved a duty under Montana law to file a timely declaratory action" and "not whether an insurer that had provided a defense under a reservation could unilaterally decide to withdraw it." Def.'s Resp. 16-17.  Also noted by Ohio Farmers, the timeliness of the commencement of the declaratory judgment action here is not at issue.  Id. at 17.  Indeed, Courtland initiated this declaratory judgment action one day after learning of Westfield's decision to withdraw its defense and later on the same day that the Zimmer Kunz attorneys filed their motion to withdraw in Courtland II.  Additionally, the rejection of the conditional offer of insurance coverage is not at issue here.

In Osprey Consulting, the insurance company, Westport, provided a defense under a reservation of rights for over two years before determining no coverage existed and "unilaterally" withdrawing the defense it had been providing.  466 F. Supp. 3d at 538.  Its insureds instituted a declaratory judgment action seeking, inter alia, a declaration that Westport had breached

37

its duty to defend by withdrawing from its "voluntarily assumed" duty.  Id. at 540–41.  Applying Maryland law, the district court found that Westport, by its unilateral withdrawal of its defense, improperly withdrew the defense it had been providing to its insureds, but did not reach the question of whether the policies provided coverage.  Id. at 543–44.  In reaching this conclusion, the court focused on the terms of the insurance policy – including that Westport was provided no right under the policy to unilaterally withdraw representation – and the language Westport used in coverage letters it had sent to its insureds – particularly whether Westport had reserved all rights or just the right to challenge its duty to defend through a declaratory judgment.  Id. at 541–42.  Unlike the insurer in Osprey Consulting, Ohio Farmers received court approval before its panel counsel withdrew from representing Courtland.  As already noted, panel counsel's motion to withdraw as counsel for the counter-defendant Courtland indicated that the withdrawal was premised on Ohio Farmers' determination of no coverage, and Courtland did not object to the motion to withdraw.

Courtland also cites to Potter, an unpublished decision of the Fourth Circuit Court of Appeals wherein the court, applying North Carolina law, found the insurer's withdrawal of the defense provided to its insured after obtaining a declaratory judgment on the issue of coverage was

justified, even though the appeal of the declaratory judgment remained pending.  242 F. App'x 94.  As the court was only determining whether the insurer had a continued duty to defend until resolution of all appeals of the declaratory judgment, the case is factually distinguishable from the present matter.

All of these cases are either distinguishable from the instant action or are contrary to Courtland's position.  Court approval of the withdrawal of counsel is a critical point in Courtland's argument, yet Courtland wrongly insists that Westfield did not receive court approval to do so.  In his December 22 declaration filed in support of Courtland's Motion for Summary Judgment, Callaghan states that Westfield had not "obtained Court approval to withdraw its defense of Courtland to the UCC counterclaims in the 2019 case."  Dec. 22 Callaghan Decl. ¶ 46.  The record, however, is quite clear that Westfield's counsel's withdrawal was not only approved by the court, but was unopposed by Courtland.  Because the cases cited by Courtland are distinguishable from the matter at hand and since Westfield did not "unilaterally" withdraw the defense it provided to Courtland, but instead withdrew following court approval, the court finds that Westfield did not unjustifiably withdraw its defense of Courtland against Union Carbide's amended counterclaims.

E.   <u>Waiver and Estoppel of Presenting Policy Defenses</u>

Intertwined with Courtland's untenable position that Westfield improperly withdrew its defense is Courtland's argument that Westfield assumed the defense of Courtland against Union Carbide's amended counterclaims without a reservation of rights, and thereby waived and is estopped from invoking the various policy exclusions to deny coverage.

Generally, "the principles of waiver and estoppel are inoperable to extend insurance coverage beyond the terms of an insurance contract." <u>Potesta</u>, 504 S.E.2d at 147;[24] <u>see also</u> <u>Ins. Co. of N. Am. v. Nat'l Steel Serv. Ctr. Inc.</u>, 391 F. Supp. 512, 517 (N.D.W. Va. 1975).  The West Virginia Supreme Court of Appeals in <u>Potesta</u> described three exceptions:

> Exceptions to the general rule that the doctrine of estoppel may not be used to extend insurance coverage beyond the terms of an insurance contract, include, but are not necessarily limited to, instances where an insured has been prejudiced because: (1) an insurer's, or its agent's, misrepresentation made at the policy's inception resulted in the insured being prohibited from procuring the coverage s/he desired; (2) an insurer has represented the insured without a reservation

---

[24] The court notes that the waiver and estoppel issue in <u>Potesta</u> was marginally different from the waiver and estoppel issue currently before the court.  In <u>Potesta</u>, where the court responded to certified questions, the issue was whether the insurer had waived or was estopped from asserting a previously unasserted reason for denying coverage.  504 S.E.2d at 140.

of rights; and (3) the insurer has acted in bad faith.

504 S.E.2d at 148–49.  The court in Potesta called "represent[ation] [of] the insured without a reservation of rights" a "commonly recognized exception."  Id. at 148.

To prove waiver, an insured must show "by clear and convincing evidence . . . that the insurer intentionally and knowingly waived" the defense.  Syl. Pt. 3, id.  To prevail under the doctrine of estoppel, an insured must "prove that s/he was induced to act or to refrain from acting to her/his detriment because of her/his reasonable reliance" on the actions of the insurer.  Syl. Pt. 4, id.  While implied waiver may be used to prohibit an insurer "from subsequently asserting a technical ground for declination of coverage, implied waiver may not be utilized to prohibit the insurer's subsequent denial based on the nonexistence of coverage."  Syl. Pt. 6, id.  Proof of prejudice or detrimental reliance is not necessary to establish common law waiver.  Syl. Pt. 3, Parsons, 785 S.E.2d 844.

The West Virginia Supreme Court of Appeals has adopted "the general rule that an insurer's knowledgeable, unconditional conduct of the defense of an action brought against its insured may constitute a waiver of the terms of the policy and an estoppel of the insurer to assert any such grounds."  McMahon &

Sons, 356 S.E.2d at 493.  Representation is not unconditional if
it is made under a reservation of rights, which was recognized
in Potesta as a way to guard against later claims of waiver or
estoppel if the insurer subsequently withdrew its defense.  See
504 S.E.2d 135.

West Virginia courts have not examined in detail the
requirements for an effective reservation of rights letter.  In
Potesta, the reservation of rights letter at issue "inform[ed]
[the insured] that there were 'some questions of coverage
provided in the coverage forms of [the] liability coverage'
[and] . . . specifically referenced 'exclusions [sic] M on page
3 of 10; exclusions 1, 5, and 6.'"  Id. at 148.  Similarly, the
court in Dye v. Farmers & Mechanics Mutual Insurance Company of
West Virginia, No. 22-ICA-301, 2023 WL 7922892 (W. Va. Int. Ct.
App., Nov. 16, 2023) approved of a reservation of rights letter
"which outlined the policy, and certain exclusions to the policy
that [the insurer] believed would apply to [the] lawsuit."  2023
WL 7922892 at *6.

Additionally, the court in Potesta cites four cases
from other jurisdictions that apply the reservation of rights
exception as examples of when the lack of such a reservation
estops withdrawal.  See 504 S.E.2d at 148-49.  In Turner
Liquidating Co. v. St. Paul Surplus Lines Insurance Co., 638

N.E.2d 174, 179 (Ohio App. 1994), the Ohio appellate court found the insurer could not prevail at summary judgment on the theory that it reserved its rights when the insurer had provided a defense for nearly a year prior to asserting the reservation of rights.  In Pacific Indemnity Co. v. Acel Delivery Service, Inc., 485 F.2d 1169 (5th Cir. 1973), the Fifth Circuit Court of Appeals concluded an insurer was estopped from asserting a noncoverage defense where it had represented the insured for a year and a half without obtaining a non-waiver agreement or asserting a reservation of rights.  In Insurance Company of North America v. National Steel Service Center, Inc., 391 F. Supp. 512, 517—19 (N.D.W. Va. 1975), the Northern District of West Virginia found an insurance company was estopped from denying coverage after providing an unconditional defense for the insured for approximately four years.  In Gibraltar Insurance Co. v. Varkalis, 263 N.E.2d 823 (Ill. 1970), the Illinois Supreme Court found an insurer was estopped from asserting a coverage-based defense after providing an unqualified defense for over a year upon which the insured relied.

The distinction Potesta seems to draw with these cases is the difference between asserting a reservation of rights contemporaneously with the initial defense so as to alert the insured that the defense is not unqualified and failing to do so

in such a way as to lead the insured to rely on the defense.  It follows that <u>Potesta</u> stands for the proposition that a reservation of rights letter is effective if, as here, it prevents the insured from believing that the defense is unconditional.

Ohio Farmers argues that it is not estopped from presenting coverage defenses based on policy exclusions inasmuch as Westfield did not provide an "unconditional defense" to Courtland, but instead "reserved its rights in writing as early as May 6, 2021," and never "misled Courtland to expect that Westfield would be providing coverage without reservation." Def.'s Reply 7, ECF No. 31.

The letter, sent by Westfield claims personnel on May 6, 2021, "acknowledges" Courtland's letter dated March 31, 2021 tendering pending claims against [Courtland]."  Letter from S. Karapashev to M. Callaghan, May 6, 2021, at 1, Def.'s Reply Ex. A, ECF No. 31-1.  The letter continues by noting the claims being brought by Courtland against Union Carbide, and the counterclaims being pursued by Union Carbide against Courtland. <u>Id.</u> at 2.  Westfield then explains that it "is currently investigating whether [Courtland] is entitled to any rights or coverage in connection with any actions or proceedings relating to the above claim" and that such investigation "is without

prejudice and is not intended to waive any rights or obligations of either you or Westfield." Id.  Westfield clearly states it "hereby reserves all of its rights and defenses under such policies." Id.

Courtland itself admits in its briefing that Westfield indicated after the filing of Union Carbide's amended counterclaim that the defense provided by Westfield was under a reservation of rights, identifying the May 6, 2021 letter, the November 12, 2021 phone call from Kesner, and the February 22, 2022 letter.  In his December 22 declaration, Callaghan states: "On November 12, 2021, I received a telephone call from Brent Kesner, Esq, . . . who advised that Westfield would be providing a defense to Courtland against the UCC amended counterclaims under a 'reservation of rights.'  Mr. Kesner, however, did not identify any such rights."  Dec. 22 Callaghan Decl. ¶ 25.

The letter from Westfield's coverage counsel to Courtland's trial counsel on February 22, 2022, stated that the defense provided by Ohio Farmers "has been . . . under reservation of rights, pending completion of its coverage investigation."  Letter from B. Kesner to M. Callaghan, Feb. 22, 2022, at 1, Def.'s Reply Ex. B, ECF No. 31-2.  The letter again notes that Westfield has "retained counsel for the defense of

the counterclaim under reservation of rights, while Westfield continue[s] its coverage investigation." Id. at 2.

Courtland also argues in its reply that "[s]imply undertaking the defense 'under a reservation of rights' without specifying those rights is an insufficient and ineffective reservation of rights; it is tantamount is [sic, to] no reservation at all." Courtland Reply 5.

In support of this contention, Courtland cites only to World Harvest Church, Inc. v. GuideOne Mutual Insurance Co., 695 S.E.2d 6 (Ga. 2010), wherein the Supreme Court of Georgia held, inter alia, that while "a reservation of rights is not required to be in writing," the insurer did "not effectively reserve its rights to deny coverage under the circumstances set forth[,] . . . and that instead a more unequivocal reservation of rights . . . is necessary." 695 S.E.2d at 10. In concluding that the insurer's oral attempt to reserve its rights was ineffective, the court cited to several cases interpreting Georgia law for the proposition that a reservation of rights must "fairly inform" the insured that the insurer's defense of the action is subject to a reservation of rights and that when providing a defense under a reservation of rights, the insurer "should also inform the insured of the specific 'basis' for [the insurer's] reservations about coverage." Id. Courtland has provided no

46

West Virginia case law on whether an insurer's reservation must provide the specific basis for invoking its reservation of rights and, indeed, the court is not aware of any West Virginia case that supports this contention.

Moreover, even if Westfield's reservation of rights were insufficient, Courtland would still have to overcome the West Virginia Supreme Court of Appeal's decision in Potesta.  As previously noted, Potesta provides that, generally, the "principles of waiver and estoppel are inoperable to extend insurance coverage beyond the terms of the insurance contract." 504 S.E.2d at 147.  The court there held that "waiver may not be utilized to prohibit the insurer's subsequent denial based on the nonexistence of coverage," but the doctrine of estoppel may be used to extend coverage when "an insurer has represented the insured without a reservation of rights." Id. at 148.  Given that the dispute between Courtland and Ohio Farmers concerns the nonexistence of coverage, waiver may not be used to extend coverage.  See Westfield Ins. Co. v. Davis, 232 F. Supp. 3d 918, 928 (S.D.W. Va. 2017) ("Since Westfield is denying coverage based on the 'nonexistence of coverage,' the doctrine of implied waiver is inapplicable.").  Courtland has failed to show that the doctrine of waiver applies.

As for estoppel, in order to invoke that doctrine Courtland must show that it was induced to act or refrain from acting, to its detriment, because of its reasonable reliance on the actions of the insurer.  See Syl. Pt. 4, Potesta, 504 S.E.2d 135.

Courtland's claim of estoppel fails for several reasons.  First, nowhere in any of Courtland's briefing does it outline the elements of estoppel and argue that they are applicable here.  See, e.g., Courtland Reply 5; Courtland Mem. Supp.  Next, Courtland cannot show that it was reasonable for it to rely on the provision of a defense by Ohio Farmers.  While Westfield did not specifically identify the provisions that it thought may preclude coverage, it noted the information it would require to make the coverage determination, thus communicating the areas of coverage concern.  Additionally, Westfield clearly and consistently indicated that its defense was being provided under a reservation of rights pending the conclusion of its coverage investigation and reasserted as much throughout the period when Westfield panel counsel provided a defense to Courtland.

Finally, Courtland has provided no evidence that the purported reliance caused it to suffer a detriment.  In fact, in one of Courtland's first correspondences with Westfield,

48

Courtland indicated its desire that "its current counsel ([Callaghan] and [his] co-counsel) [be] appointed to defend it." Jan. 5 Callaghan Decl. ¶ 14.  Throughout Westfield's involvement in Courtland II, Callaghan continued to insist that Westfield appoint him and his trial team to represent Courtland against Union Carbide's amended counterclaims.  Id. at ¶¶ 24–26, 32. Furthermore, Callaghan continued to represent Courtland as plaintiff, as Westfield's conditional defense was only as to the Union Carbide counterclaims, a minor part of the whole case, and Callaghan thus continued to be heavily involved in the litigation and to represent Courtland throughout.  Thus, Courtland cannot say that it relied to its detriment on the defense being provided by Westfield.

In light of the foregoing, particularly when considering that the Zimmer Kunz attorneys' motion to be relieved from their duty to defend and indemnify was granted without opposition from Courtland, the court finds that Ohio Farmers has not waived, nor is it estopped from asserting lack of coverage based on various coverage defenses.  Ohio Farmers' duty to defend and indemnify Courtland ended when the court granted, without opposition, the coverage attorneys leave to withdraw from their representation of Courtland after they had determined that there was no coverage afforded by the insurance policies for the Union Carbide amended counterclaims.

## IV. CONCLUSION

Based upon the foregoing, it is ORDERED that:

1.  Ohio Farmers' Motion for Summary Judgment (ECF No. 22) be, and it hereby is, GRANTED;

2.  Courtland's Motion for Partial Summary Judgment (ECF No. 24) be, and it hereby is, DENIED; and

3.  The court DECLARES that the Ohio Farmers Policies do not provide coverage for the defense or indemnification of Courtland for the claims asserted against it by Union Carbide in Union Carbide's Amended Counterclaim, and that Ohio Farmers has no duty to defend or indemnify Courtland for the claims asserted against it by Union Carbide in Union Carbide's Amended Counterclaim.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: April 23, 2024

John T. Copenhaver, Jr.
Senior United States District Judge